Estate of Marjorie Gilbert Brush, Deceased, Graham M. Brush, David M. Brush, Graham M. Brush, Jr., and Donald K. Brush, Executors v. Commissioner.
Estate of Brush v. Commissioner
Docket No. 89985.
United States Tax Court
T.C. Memo 1963-186; 1963 Tax Ct. Memo LEXIS 158; 22 T.C.M. (CCH) 900; T.C.M. (RIA) 63186; July 8, 1963
*158 1. The fair market value of 62,982 shares of the capital stock of Seatrain Lines, Inc. included in the estate of the decedent was, on the applicable alternate valuation date, $5.50 per share or a total of $346,401. 2. The amount of $8,031.58 which was paid out of the estate's funds to one of the executors in his individual capacity, in partial reimbursement to the latter of expenses that he had incurred in unsuccessfully prosecuting a so-called "stockholders' action" against officers and directors of said Seatrain corporation, is not deductible as an administration expense of the decedent's estate under section 2053(a)(2) of the 1954 Code. John N. Cole for the petitioners. Lawrence A. Wright for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined a deficiency in estate tax in respect to the above named estate in the amount of $101,873.25. The issues to be decided are: 1. What was the fair market value on the applicable alternate valuation date of April 6, 1959, of 62,982 shares of the capital stock of Seatrain Lines, Inc., included in the gross estate of the decedent? 2. May there be deducted from the gross estate, as an administration *159 expense, the amount of $8,031.58 which was paid out of estate funds to one of the executors in his individual capacity, in partial reimbursement to the latter of expenses that he had incurred in unsuccessfully prosecuting a so-called "stockholders' action" against the officers and directors of said Seatrain Lines, Inc.? All other issues raised by the pleadings will be dealt with in the computation to be made herein under Rule 50. Adjustments to be there made, include: (1) Allowance, pursuant to a concession of respondent on brief, of a deduction of $412 for funeral flowers; (2) allowance of appropriate credit for state death taxes; and (3) allowance of appropriate deductions for anticipated expenses incident to the present proceeding. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and all exhibits thereto attached are incorporated herein by reference. Marjorie Gilbert Brush (herein called the "decedent") died testate on April 6, 1958, a resident of Warren, Connecticut. The petitioners are the executors of her last will and testament. One of these executors, Graham M. Brush, is the surviving husband of the decedent; and the other three are sons of *160 him and the decedent. The decedent's estate is being administered under the jurisdiction of the probate court for the district of Litchfield, at Litchfield, Connecticut. The Federal estate tax return for the estate was filed with the district director of internal revenue at Hartford, Connecticut. In this return, the executors elected to have the gross estate valued as of the alternate date or dates authorized by section 2032 of the 1954 Code. Facts re Issue I The decedent, at the time of her death, owned 62,982 shares of the capital stock of Seatrain Lines, Inc. The parties hereto are agreed that these shares are includable in the decedent's gross estate for Federal estate tax purposes; and they also are agreed that the applicable valuation date to be used in fixing the alternate value of said shares pursuant to said section 2032 of the Code is April 6, 1959 (being 1 year subsequent to the date of the decedent's death). Seatrain Lines, Inc. is a Delaware corporation that was organized in 1931. Its principal office is located at Edgewater, New Jersey, in the New York port area. Shortly after incorporation, it acquired the assets of Over-seas Railways, Inc.; and at all times since, *161 it has been engaged in owning and operating ocean-going ships, as a common carrier by water. On the applicable valuation date here involved and also for several years prior thereto, it had a fleet of six vessels that actively engaged in transporting loaded railroad freight cars in coastwise voyages between the ports of New York (Edgewater, New Jersey), Savannah, New Orleans, and Texas City, Texas. Each of these vessels was specially designed and equipped to handle such type of cargo, and each had capacity for carrying 100 freight cars at one time (being approximately equivalent to the number of cars in a mile-long train). Also, at each of the above-mentioned cities, the corporation owned and maintained terminal facilities, including docks, freight-car switching and assembly yards, and equipment used in loading and unloading the ships. In addition, beginning in November 1958 and continuously thereafter, the corporation offered to the shipping public as an adjunct to its above-mentioned "Seatrain" service, a new so-called "Seamobile" service. In such operation, large freight containers resembling truck-trailer bodies, that could be loaded at factories or elsewhere without reloading at *162 the seaports and that were capable of being moved interchangeably on rail and highway, were transported by the corporation in twice-weekly sailings of its Seatrain ships, between the ports of New York and Texas City. The authorized capital stock of the corporation, at all times since 1948, has consisted of 2,200,000 shares of $4 par value capital stock; and of this, 1,412,891 shares were outstanding during each of the years 1956 through 1959 (which includes the here applicable valuation date of April 6, 1959). The stock has never been listed on any stock exchange; but since prior to 1958, it has been traded in over-the-counter transactions, principally in New York City. Records of the daily bid and asked prices in such over-the-counter market were published in the Wall Street Journal and in other recognized media of financial information. Also financial reports regarding Seatrain Lines, Inc., pertaining to its history, management, earnings, assets and capital stock, were published from year to year in Moody's Transportation Manual. [1] *163 The registrar of the corporation's shares was The New York Trust Company of New York City (and its successor, Chemical Bank New York Trust Company); and the authorized transfer agent for the stock was The Corporation Trust Company, of New York City and Jersey City. The records of said transfer agent for periods here pertinent, show the identities of the various shareholders of record, the number of shares listed for each, and transfers of the shares. As of the close of business on December 19, 1958, there were 1,112 shareholders listed on the records of said transfer agent; on the following May 4, 1959, the number of such shareholders was 1,213; and a year later, on May 4, 1960, the number was 1,172. More than two-thirds of the 1,412,891 shares which were outstanding during the above-mentioned periods were owned either directly or beneficially by investors of three principal groups or classes. On May 4, 1959, and also on the valuation date of April 6, 1959, the distribution of stock ownership among such groups *164 was substantially as follows: (1) 266,000 shares were owned and held of record by Sun Oil Company, Philadelphia, Pennsylvania. This was the largest single holding. Said company was represented on Seatrain's board of directors by 1 of the 10 directors. (2) 104,900 shares were owned beneficially through nominees, by two foundations: 70,700 shares by Watson Foundation; and 34,200 shares by The Pioneer Fund, Inc. Each of these foundations had a representative on the board of directors. (3) 684,558 shares were owned either directly or beneficially by individuals who included: Active or former directors and officers of the present corporation, and members of their families., and present or former employees of the corporation, and members of their families. There were about 8 or 10 family groups that included active or former directors and officers; and the share ownerships within these groups remained relatively unchanged from year to year, except for intra-family transfers. One individual stockholder within this class held more than 100,000 shares; two others held more than 70,000 shares each; and four others held more than 40,000 shares each. Included also within one of these family groups *165 were the 62,982 shares owned by the estate of the decedent here involved. The number of shares held by employees and their families was about 4,613. The other shareholders, not comprehended within the above groups, included: Friends of the active and former directors; individuals and business organizations that conducted business with the Seatrain corporation; brokerage firms; and members of the general public. Condensed balance sheets of Seatrain Lines, Inc., as of December 31 of each of the years 1957 through 1959, are as follows: ASSETS
1957
1958
1959
Current Assets
Cash
$ 1,893,315
$ 1,735,558
$ 1,059,534
U.S. Government securities
5,988,105
2,000,000
2,000,000
Trade receivables (including claim for
933,517
839,079
1,006,477
refund of taxes)
Other
237,111
278,217
234,847
Total Current Assets
$ 9,052,049
$ 4,852,854
$ 4,300,858
Property and Equipment, at cost
Vessels
$17,112,138
$17,300,951
$17,646,785
Terminal property and equipment
3,961,211
4,671,819
4,669,492
Other property and equipment
665,704
1,790,168
2,178,156
Construction work in progress
370,172
1,866,096
512,955
$22,109,225
$25,629,034
$25,007,388
Less: Accumulated depreciation
10,562,073
11,356,884
12,434,412
Net property and equipment
$11,547,152
$14,272,150
$12,572,976
Other Assets
Preferred ship mortgage receivable, on
$ 2,100,000
$ 1,800,000
$ 1,500,000
ship sold
Miscellaneous
756,697
1,016,368
1,227,563
Total Other Assets
$ 2,856,697
$ 2,816,368
$ 2,727,563
Total Assets
$23,455,898
$21,941,372
$19,601,397
LIABILITIES AND STOCKHOLDERS' EQUITY
Current Liabilities
Accounts payable
$ 807,251
$ 1,209,033
$ 684,618
Other
1,438,165
590,807
406,055
Total Current Liabilities
$ 2,245,416
$ 1,799,840
$ 1,090,673
Unearned income and deferred credits
$ 2,416,328
$ 2,075,412
$ 1,741,821
Long-term debt due after 1 year
$ 2,145,000
$ 1,883,000
$ 1,641,000
Stockholders' Equity
Capital stock
$ 5,651,565
$ 5,651,565
$ 5,651,565
Appropriated for estimated increase in
vessel replace-
ment cost
5,827,227
6,187,227
6,547,227
Unappropriated
5,170,362
4,344,328
2,929,105
Total Stockholders' Equity
$16,649,154
$16,183,120
$15,127,897
Total Liabilities and Stockholders'
$23,455,898
$21,941,372
$19,601,397
Equity
Reflected in the above balance sheets
are: 1957
1958
1959
Net current assets
Total
$ 6,806,633
$ 3,053,014 *
$ 3,210,185
Per share
$4.81
$2.16
$2.27
Net tangibles per share
$11.78
$11.45
$10.71
*166 The operating revenues, earnings, and dividends of Seatrain Lines Inc. on a pershare basis, for the years 1950 through 1959 (all as stipulated by the parties), were: Shares
Cash
Year
Net income
common
Earned
Stock
dividends
ended
Operating
or (loss)
stock
per share
dividend
paid
12/31
revenues
total
outstanding
common
paid
per share
1950
$ 8,481,847
$2,137,304
$1,344,021
1.59
0.50
1951
8,495,434
1,490,477
1,344,021
1.11
0.50
1952
11,622,621
1,968,349
1,344,021
1.46
0.50
1953
12,026,725
1,868,793
1,329,146
1.41
0.37 1/2
1954
12,238,436
1,824,798
1,059,601
1.72
0.50
1955
12,925,474
2,071,795
1,412,889
1.47
33 1/3%
0.50
1956
11,803,517
1,176,686
1,412,891
0.83
0.50
1957
11,265,391
1,203,787
1,412,891
0.85
0.50
1958
9,331,997
84,892
1,412,891
0.06
0.50
1959
9,626,787
( 364,315)
1,412,891
(0.26)
0.12 1/2
Regarding the 1938 operations, the corporation, in its Twenty-eighth Annual Report to its stockholders for the year 1958, which was issued on April 24, 1959 (shortly after the applicable valuation date here involved), included the following statements: EARNINGS Terminated voyage revenues for 1958 *167 declined 19.1% to $9,331,997 as compared to the $11,531,183 for 1957. This decline in revenues resulted primarily from: depressed economic activity, which affected all transportation companies, particularly those along the Eastern seaboard; rate reductions by railroads and other competitive carriers; and loss of voyages during the period of the conversion of vessels for the new Seamobile service. In 1958, the equivalent of 135 1/2 two-week voyages were completed, compared with 152 two-week voyages for 1957. * * *
CAPITAL PROGRAM The increase in plant and equipment amounting to $3,519,809 was primarily for the new Seamobile service, which was offered to the shipping public beginning in November. Four vessels * * * were converted for the Seamobile service in 1958, and at the same time other improvements were made to these vessels to permit carriage of extra-long freight cars below the main decks. During the year a major part of the machinery for the new vessel authorized by the stockholders at their meeting of May 15, 1956 was received and paid for. In February of 1958, Ship Container Corporation, a wholly owned subsidiary company, was organized primarily to manufacture special cargo *168 containers and associated equipment for your Company's Seamobile program. The 179 cargo containers presently owned by Seatrain were manufactured by this subsidiary. At the end of this production run in February, 1959, the operations of Ship Container Corporation were closed down. Your Management is presently exploring the possibilities of purchasing additional containers and other equipment for the Seamobile program more economically and efficiently from other vendors. FINANCING In addition to the amount expended for capital programs in 1958, it is expected that substantial additional capital funds will be required in 1959 and succeeding years to develop the Seamobile program, and your Management is studying alternative plans for financing these programs. CURRENT PROGRAM The contribution of Seamobile to 1958 revenues was negligible, since operations began late in the year and conversion of the four vessels was not completed until early 1959. The trend this year has been distinctly encouraging, however, and plans are now being made to acquire additional containers and chassis of improved design, as well as to convert the SEATRAINS GEORGIA and LOUISIANA for this service. Application *169 has been made to the Interstate Commerce Commission for rights to transport traffic between the ports of Savannah and New Orleans and it is believed that such traffic will contribute substantially to the Company's revenues with very little added expense. Your present Management, while developing the Seamobile service to fit the needs of shippers and consignees for whom that service is particularly desirable, is also endeavoring to obtain improved and more cooperative relationships with connecting railroads. An agreement for through routes and joint rates was signed with a major Eastern railroad early in 1959, and it is hoped that agreements with other railroads will follow in the near future. Your Management believes that, with aggressive pursuit of these and other programs, your Company will show reasonable earnings for 1959, and is confident that the future of the Company is promising. DIVIDENDS Cash dividends of 50( per share were declared in 1958, the same as in 1957. The Stockholders have already been advised that earlier this month the Directors decided to take no action with respect to the quarterly dividend usually paid on April 15, considering it prudent to await further developments *170 on 1959 earnings and the formulation of a financing plan. It is hoped that dividends can be resumed later in the year. MANAGEMENT CHANGES On October 15, 1958, Mr. John L. Weller who had been elected President on October 7, 1957, became Chief Executive Officer. On December 4, 1958, Mr. Hunt T. Dickinson was elected to succeed Mr. Graham M. Brush as Chairman of the Board of Directors. * * * Regarding the 1959 operations, Seatrain in its Twenty-Ninth Annual Report to the stockholders, stated in part as follows: EARNINGS Following upon an encouraging trend in the first half of 1959, results in the last half were disappointing, primarily because of a strike of longshore workers in October, the steel strike which lasted from July 15th through November 7th, a prolonged strike at the plant of an important consignee in New Orleans, and selective railroad rate reductions on pulpboard which eliminated Seatrain from participation in the movement of that important commodity from Savannah. Water line operating revenues in the first half of 1959 were 9.8% greater than in the previous year, but in the last six months they were 3.2% less than the year before. For the year as a whole, water line operating *171 revenues were $9,626,687, an increase of 3.2% over 1958; but operating expenses increased 8.0%, resulting in an operating loss for the year of $871,271. * * *
FINANCIAL CONDITION Despite the adversities of the year, the financial condition of your Company remains sound. Net current assets at yearend were $3,210,185, an increase of $157,171 from December 31, 1958, and included cash and U.S. Government notes of $3,059,534. None of the 1,412,891 shares of capital stock outstanding on the applicable valuation date of April 6, 1959, was restricted in the sense that the shares could not be freely traded by their holders on that date. The daily bid and asked prices for shares of Seatrain Lines, Inc. in the over-the-counter market, as published in the Wall Street Journal for January 6, 1959 through July 6, 1959, (which includes the applicable valuation date of April 6, 1959) were as follows: 1959
JAN.
FEB.
MAR.
B
A
B
A
B
A
6
8 5/8
9 1/2
2
8 1/4
9 1/2
2
8 5/8
9 5/8
7
8 1/2
9 1/4
3
8 3/4
9 3/4
3
8 1/2
9 1/2
8
8 1/2
9 1/4
4
9
10
4
8 1/2
9 1/2
9
8 5/8
9 1/2
5
9 3/8
10 3/8
5
8 1/2
9 1/2
12
8 5/8
9 5/8
6
8 5/8
9 5/8
6
8 3/8
9 1/4
13
9
9 7/8
9
8 5/8
9 5/8
9
8 1/2
9 1/2
14
9 1/2
10 1/2
10
8 3/8
9 1/4
10
8 5/8
9 5/8
15
10
11 1/2
11
8 1/4
9 1/8
11
8 1/2
9 1/2
16
10
11
12
8 1/2
9 1/4
12
8 1/2
9 1/2
19
10 3/8
11 1/4
13
8 3/4
9 3/4
13
8 1/2
9 1/2
20
10 1/4
11 1/8
16
9
10
16
8 1/2
9 1/2
21
10 1/8
11
17
9 1/8
10 1/8
17
8 1/2
9 1/2
22
10 1/8
11
18
9 1/8
10
18
8 1/2
9 1/2
23
10
10 7/8
19
9
9 7/8
19
8 3/8
9 1/4
26
10 1/8
11
20
8 7/8
9 7/8
20
8 3/8
9 1/4
27
10
10 7/8
24
9
9 7/8
23
8 1/2
9 1/2
28
10
10 7/8
25
8 3/4
9 5/8
24
8 5/8
9 5/8
29
9 1/4
10 1/8
26
8 3/4
9 5/8
25
8 1/2
9 1/2
30
8 1/2
9 3/4
27
8 3/4
9 5/8
26
8 1/2
9 1/4
30
8 1/2
9 1/4
31
8 3/8
9 1/8
1959
APR.
MAY
JUNE
JULY
B
A
B
A
B
A
B
A
1
8
8 7/8
1
7 1/8
7 7/8
1
6 5/8
7 1/2
1
6 1/8
7
2
8 1/4
9 1/8
4
7
7 7/8
2
6 5/8
7 3/8
2
6 3/4
7 1/8
3
7
8 1/8
5
7
7 7/8
3
6 3/8
7 1/4
6
6 1/4
7
6
7
7 7/8
6
6 5/8
7 5/8
4
6 1/4
7 1/8
7
7
7 7/8
7
6 3/8
7 1/4
5
6 1/4
7 1/8
8
7 1/8
7 7/8
8
6 1/2
7 1/4
8
6 3/8
7 1/8
9
7
7 3/4
11
6 1/2
7 3/8
9
6 1/8
7
10
7 1/8
7 7/8
12
6 1/4
7 1/8
10
6 1/2
7 3/8
13
7
7 7/8
13
6 1/4
7 3/8
11
6 3/4
7 5/8
14
7 7/8
8 1/4
14
6 1/8
7
12
6 1/2
7 3/8
15
7 3/8
8 1/4
15
6 1/8
7
15
6 3/8
7 1/2
16
7 1/2
8 1/4
18
6 1/8
7
16
6 3/8
7 1/8
17
7 1/2
8 1/4
18
6 1/4
7
17
6 3/8
7 1/8
20
7 5/8
8 1/2
20
6 3/8
7 1/4
18
6 1/4
7 1/8
21
7 3/4
8 5/8
21
6 1/2
7 3/8
19
6 1/4
7
22
7 1/2
8 3/8
22
6 1/2
7 3/8
22
6
6 7/8
23
7 3/8
8 3/8
25
6 1/2
7 1/4
23
6
6 7/8
24
7 5/8
8 3/8
26
6 1/2
7 1/4
24
6 1/4
7
27
7 1/4
8
27
6 1/2
7 3/8
25
6 1/4
7 1/8
28
7 1/4
8 3/8
28
6 1/2
7 3/8
26
6 1/4
7 1/8
29
6 7/8
7 5/8
29
6 1/2
7 1/4
29
6
6 7/8
30
6 7/8
7 5/8
30
6 1/8
6 7/8
*172 The daily bid and asked prices for April 1, 1959, through April 15, 1959, as published by the National Quotation Bureau, were as follows: 1959
Bid
Asked
April 1
Kohn Bros O'Keefe & Co. N. Y.
8 3/8
8 7/8
Simmons & Co. N. Y.
8 3/8
8 7/8
Lapham & Co. N. Y.
8 1/2
8 3/4
Troster Singer & Co. N. Y.
8 1/4
8 3/4
Grady Berwald & Co. Inc. N. Y.
8 3/8
8 7/8
April 2
Kohn Bros O'Keefe & Co. N. Y.
8 1/4
8 3/4
Grady Berwald & Co. Inc. N. Y.
8 1/4
8 3/4
Troster Singer & Co. N. Y.
8 1/4
8 3/4
Lapham & Co. N. Y.
8 1/4
8 3/4
Simmons & Co. N. Y.
8 1/4
8 3/4
April 3
Grady Berwald & Co. Inc. N. Y.
7
7 3/4
Troster Singer & Co. N. Y.
7 1/4
8 1/4
Hay Fales & Co. N. Y.
7
Lapham & Co. N. Y.
7 1/2
8 1/2
Arnhold Feldman Co. N. Y.
7
7 1/2
Simmons & Co. N. Y.
OW
BW
April 6
Kohn Bros O'Keefe & Co. N. Y.
7
8 1/2
Hay Fales & Co. N. Y.
7
7 1/2
Troster Singer & Co. N. Y.
7 1/8
7 1/2
Arnhold Feldman Co. N. Y.
7
7 1/2
Lapham & Co. N. Y.
7 1/8
8 1/8
Simmons & Co. N. Y.
7 1/4
8 1/4
Grady Berwald & Co. Inc. N. Y.
7
7 3/4
April 7
Kohn Bros O'Keefe & Co. N. Y.
7
8 1/2
Hay Fales & Co. N. Y.
7
7 1/2
Troster Singer & Co. N. Y.
7
7 1/2
Grady Berwald & Co. Inc. N. Y.
7
7 1/2
Lapham & Co. N. Y.
6 3/4
7 1/2
Simmons & Co. N. Y.
6 3/4
7 1/2
April 8
Hay Fales & Co. N. Y.
7
7 3/8
Grady Berwald & Co. Inc. N. Y.
7
7 1/2
Lewis & Stoehr Inc. N. Y.
7 1/8
Lapham & Co. N. Y.
7
7 3/8
Simmons & Co. N. Y.
6 1/2
7 1/2
Kohn Bros O'Keefe & Co. Inc. N. Y.
7
7 3/4
Arnhold Feldman Co. N. Y.
7
7 1/2
J. W. Gould & Co. N. Y.
6 3/4
7 1/2
April 9
Kohn Bros O'Keefe & Co. N. Y.
6 3/4
7 1/2
J. W. Gould & Co. N. Y.
7
7 1/2
Troster Singer & Co. N. Y.
7
7 1/2
Grady Berwald & Co. Inc. N. Y.
7 1/8
7 1/2
Hay Fales & Co. N. Y.
7
7 3/8
Lapham & Co. N. Y.
7 1/8
7 1/2
Simmons & Co. N. Y.
7
7 3/4
April 10
Troster Singer & Co. N. Y.
7
7 1/2
Hay Fales & Co. N. Y.
7
7 1/2
J. W. Gould & Co. N. Y.
7
7 1/2
Grady Berwald & Co. Inc. N. Y.
7
7 1/2
Lapham & Co. N. Y.
7 1/8
7 5/8
Simmons & Co. N. Y.
6 3/4
7 1/2
April 13
Lapham & Co. N. Y.
7 1/2
8
Troster Singer & Co. N. Y.
7 1/8
7 1/2
J. W. Gould & Co. N. Y.
7
7 1/2
Hay Fales & Co. N. Y.
7
7 1/2
Arnhold Feldman & Co. N. Y.
7 1/8
7 5/8
Grady Berwald & Co. N. Y.
7 1/8
7 5/8
Simmons & Co. N. Y.
6 1/2
7 1/2
April 14
J. W. Gould & Co. N. Y.
7 1/2
8
Troster Singer & Co. N. Y.
7 1/2
8
Simmons & Co. N. Y.
7 1/4
8
Arnhold Feldman Co. N. Y.
7 1/8
7 5/8
Hay Fales & Co. N. Y.
7 3/8
7 7/8
Lapham & Co. N. Y.
7 1/2
8
Grady Berwald & Co. Inc. N. Y.
7 3/8
7 7/8
Clark Dodge & Co. N. Y.
April 15
J. W. Gould & Co. N. Y.
7 3/8
7 7/8
Hay Fales & Co. N. Y.
7 3/8
7 7/8
Lapham & Co. N. Y.
7 5/8
8
Simmons & Co. N. Y.
7 1/4
8
Troster Singer & Co. N. Y.
7 3/8
7 7/8
Grady Berwald & Co. Inc. N. Y.
7 1/2
8
*173 Price ranges of the shares for the years 1956 through 1959, as published in the above-mentioned Moody's Transportation Manuals, were: 1959
1958
1957
1956
High
10 3/8
9 1/2
12 1/8
13 3/4
Low
4 1/2
7 1/4
7 3/4
10 1/2
The petitioners, in the estate tax return for the decedent's estate, reported that the value as of the applicable valuation date of April 6, 1959, of the 62,982 shares of Seatrain Lines, Inc. stock included in the estate, was $3 per share or a total of $188,946. The respondent however, in his notice of deficiency herein, determined that the value of said stock on said valuation date was $464,492.25; and he explained that such adjustment in value was based on the mean between the bid and asked prices as of the "date of death" [should be "alternate valuation date"] (which mean was $7 3/8 per share). Finding of Ultimate Fact - Issue I The fair market value on the applicable valuation date of April 6, 1959, of the 62,982 shares of capital stock of Seatrain Lines, Inc. included in the decedent's estate, was $5.50 per share, or a total of $345,401. Facts re Issue II From March 1955 until October 1958, Graham M. Brush who is one of the executors of the decedent's estate, was chairman of the *174 board of directors and also chief executive officer of Seatrain Lines, Inc.; and as such, he was in charge of developing the corporation's new Seamobile program. On October 15, 1958, John L. Weller who had been elected president of the corporation about a year previous was made chief executive officer instead of Brush; on December 4, 1958, Brush was removed as chairman of the board of directors and H. T. Dickinson was elected to succeed him as chairman of the board; and on May 4, 1959, Brush failed to be reelected by the stockholders as a director. Also, David M. Brush and Graham M. Brush, Jr., both of whom are likewise executors of the decedent's estate, were discharged from their positions as officers of the corporation. Brush and his said sons, and also other members of the Brush family and the decedent's estate, were all holders of substantial amounts of Seatrain's capital stock. The above changes resulted principally from animosity and friction that developed between Brush and Weller, the president, with respect to the corporation's management, policies and operations, and in particular with regard to the large expenditures and decreased profits incident to the development of *175 the Seamobile program. Brush demanded that Weller resign and be removed from office; but the board of directors did not sustain his demand. And thereafter by action of the board, and action of the stockholders at the subsequent election of directors, Brush was "retired" both as an officer and as a director, as above shown. Thereafter in August 1959, Graham M. Brush filed a complaint in the Supreme Court of the State of New York, County of New York, which was entitled: GRAHAM M. BRUSH, SR., Individually and as a Stockholder of Seatrain Lines, Inc., suing on his own behalf and on behalf of said corporation, and on behalf of defendant, Ship Container Corporation, a wholly-owned subsidiary of Seatrain Lines, Inc., Plaintiff, - against - GEORGE S. AMORY, RICHARD BENSON, ALFRED BRITTAIN, JOHN F. COGAN, JR., HUNT T. DICKINSON, JOSEPH HODGSON, THOMAS F. MILBANK, ROBERT W. PARSONS, DONALD W. SMITH, JOHN L. WELLER, SEATRAIN LINES, INC., AND SHIP CONTAINER CORPORATION, Defendants. All of the individuals named as defendants were the then officers or directors of the Seatrain corporation. Brush was the only shareholder of Seatrain that was a plaintiff in said suit. And the corporations, Seatrain *176 Lines, Inc., and its subsidiary Ship Container Corporation, were made parties to the action without request being made to, or authorization being obtained from, the officers or directors of either of said corporations. In this complaint, Brush alleged in part that he brought this action "in his own behalf and on behalf of all other stockholders similarly situated who may desire to join in this action and contribute to the expense thereof"; he charged Weller and the other individual defendants with gross derelictions in the management and operation of Seatrain corporation and its wholly-owned subsidiary; and he prayed judgment in favor of said corporations, for damages, and also for his reasonable counsel fee and disbursements relative to the suit. The New York court ruled that the said complaint did not state a cause of action, and dismissed the suit on the ground that the alleged acts and omissions complained of were matters of business judgment. From this adverse ruling of the trial court, Brush did not appeal. Thereafter Brush made claim against the decedent's estate for the amount of $8,031.58, which is described in the petition herein as being "in payment of decedent's share *177 of expenses of litigation in prosecuting on behalf of said estate and others a stockholders' action." The executors of the estate paid the amount so claimed. In the estate tax return for the decedent's estate, the executors deducted the amount of $57,500 as "estimated administration expense" without itemizing the particular expenses so included. The respondent, in his notice of deficiency, disallowed $45,144.06 of such claimed administration expenses. The petitioners now make claim for the allowance as an additional "administration expense," of the amount of $8,031.58 which was paid from the estate to Brush in respect of the above-mentioned litigation. Opinion I. The first and principal issue herein is the value, on the applicable alternate valuation date of April 6, 1959, of the 62,982 shares of the capital stock of Seatrain Lines, Inc., included in the gross estate of the decedent. The petitioners have contended on brief that such value should be found to be $3 per share, or a total of $188,946; and the respondent on the other hand, after having determined that the value was 7 3/8 per share, has contended on brief that the value was "not less than 6 1/2 per share," or a total of *178 $409,383. The question is primarily one of fact; and since a substantial amount of evidence has been presented, such question must be resolved from a consideration and weighing of all the relevant facts and elements of value disclosed by such evidence. The applicable Treasury Regulations pertaining to estate tax provide in part: § 20.2031-2 Valuation of stocks and bonds. - (a) In general. The value of stocks and bonds is the fair market value per share or bond on the applicable valuation date. (b) Based on selling prices. If there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond. * * *
(e) Where selling prices or bid and asked prices do not reflect fair market value. If it is established that the value of any bond or share of stock determined on the basis of selling or bid and asked prices as provided under paragraphs (b) * * * of this section does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining *179 the fair market value. * * * In the instant case, we have found as an ultimate fact, and we here hold, from our consideration and weighing of all the facts and elements of value established by the evidence, that the fair market value of the stock involved, on the applicable valuation date, was $5.50 per share or a total of $346,401. In arriving at said value, we have considered among other relevant factors: The nature of the business and operations of Seatrain Lines, Inc.; the corporation's history; and its organization and management. The amount of the outstanding capital stock on and within a reasonable period prior to the applicable valuation date; the number of shareholders; the principal classes of shareholders; and the size of the larger blocks of shares held by particular shareholders. The capital structure of the corporation; the nature and amount of its current assets; the ratio of such current assets to the current liabilities, and the net current assets per share; the nature and amount of all the tangible assets, and the net tangible assets per share; and the nature and amount of the stockholders' equity - all on and within a reasonable period prior to the applicable valuation *180 date. The operating revenues, earnings and dividends on a per-share basis, both for the year of valuation and for a reasonable period prior thereto; the factors which affected the changes in the same for the years 1958 and 1959; the extent to which such factors might reasonably be regarded to be of recurrent or non-recurrent nature; and the prospects as of the applicable valuation date, with respect to the corporation's operations and earnings for a reasonable period subsequent to said date. The bid and ask prices for the shares on the over-the-counter market, on and within a reasonable period before and after the applicable valuation date; the extent to which said bid and ask prices may or may not be reasonably regarded to reflect the fair market value of the particular shares of stock here involved; the trend of such prices; and the probability as to the trend of the same over a reasonable period subsequent to the valuation date. In addition, we have carefully considered and weighed the testimony of all witnesses, including those who expressed opinions as to the value of the stock involved. As regards those witnesses who expressed opinions as to value, we have given consideration *181 to their qualifications; their familiarity with the Seatrain corporation and the facts affecting the fair market value of the stock involved; the methods of valuation, and nature and weight of the supporting data upon which they relied; and the opinion of value which each expressed, notwithstanding that we have felt impelled to modify, and not to accept, the conclusions as to value expressed by each. Also, we have given such consideration as we deemed proper to statements contained in the complaint which Graham M. Brush filed in his so-called "stockholders' action," and which he also set forth in another instrument (both of which instruments were received in evidence on request of the petitioners) - to the effect that on about October 15, 1953, which was shortly prior to the applicable valuation date, the active directors of Seatrain (who held substantial amounts of the stock involved) "decided as a group to sell their stock to some outsider or to sell the assets of SEATRAIN so as to liquidate their holdings * * * [and that said Brush] was asked to be a party to such plan but refused * * *"; and also the further statements contained in said complaint that: a. Plaintiff, his family *182 and friends owned and continue to own substantial amounts of stock of SEATRAIN. The active directors likewise either owned, controlled or represented a substantial bloc of stock of SEATRAIN. Neither group has enough, standing alone, to attract a prudent buyer. b. The active directors determined to force plaintiff, his family and friends to join with them in their plan to sell their stock in order to enable them to offer a sufficient amount of stock as to make a purchase attractive to a prudent buyer. c. Plaintiff refused the proposals of the active directors and insisted that steps be taken to resuscitate SEATRAIN and the SEAMOBILE PROJECT * * * Such statements tend to indicate, in our view, that the active directors of Seatrain who owned substantial amounts of that corporation's stock were, at least shortly prior to the applicable valuation date, attempting either to acquire additional shares of the stock or to obtain cooperation from other substantial shareholders, in order to provide majority control of the corporation. And these statements may further tend to indicate that the substantial number of shares held by the decedent's estate may for such reason have had greater value *183 as a single block, because of their potential for affording "leverage" to a potential buyer or buyers in acquiring a controlling stock interest. The petitioners (during the testimony of Brush who personally participated in the above-mentioned transactions with the directors) did not attempt to establish the details of said negotiations; and no evidence was presented regarding any actual sale, or any actual offer for purchase or sale of Seatrain stock within a reasonable period before or after the applicable valuation date, except for the over-the-counter bid and ask prices published in the Wall Street Journal and other financial media. The amount which we have hereinabove found and held to be the fair market value as of the applicable valuation date of the shares of stock here involved represents, in our opinion, the value and fair price which a willing buyer and a willing seller, each having knowledge of the facts, would on said valuation date have agreed upon. II. The second issue is whether the amount of $8,031.53, which was paid out of the estate's funds to Graham M. Brush, in partial reimbursement to the latter of expenses that he had incurred in unsuccessfully prosecuting a so-called *184 "stockholders' action" against the officers and directors of Seatrain Lines, Inc., is deductible from the gross estate of the decedent as an "administration expense." We think this question must be answered in the negative. The filing of said action as hereinabove shown, followed the involuntary "retirement" of Brush as an officer and director of Seatrain by action of the directors and stockholders. Such retirement resulted from intense animosity and disagreement between Brush and president Weller respecting the corporation's management, policies and operations, and especially with regard to the development of the new Seamobile program. Brush was the only shareholder of Seatrain that was named as a plaintiff in said suit; and the corporations, Seatrain and its subsidiary, were made parties thereto without request being made to, or authorization being obtained from, the officers or directors of either of these corporations. The court in which the action was filed, ruled that the complaint did not state a cause of action and dismissed the suit; and Brush did not appeal. Brush testified that the aggregate cost of the suit was more than $30,000; but there is no evidence regarding the separate *185 items which were included in said amount. Also there is no evidence as to how or by what method of allocation said sum of $8,031.58 was calculated to be the estate's share of the aggregate expense; and no evidence that any other portion of the total expense was allocated to or paid by any shareholder except Brush. Moreover, the petitioners have not established that the prosecution of the suit was essential to proper settlement of the decedent's estate; or that any portion of Brush's litigation expense was allowed or approved as a proper administration expense by the probate court for the district of Litchfield, Connecticut, which had jurisdiction of the estate; or that the same qualifies for deduction as an administration expense under section 2053(a)(2) of the 1954 Code, which allows deduction for only such amounts for administration expenses "as are allowable by the laws of the jurisdiction * * * under which the estate is being administered." We decide this issue in favor of the respondent. Decision will be entered under Rule 50. Footnotes
1. At the trial herein, reference was made to these reports in Moody's Transportation Manual; and the parties agreed that the Court might take judicial notice of the same. In the Manual for 1958, such report appears on pages 1450-1451; in the Manual for 1959, it is on page 1443; and in the Manual for 1960, it is on page 1439.
*. The decrease in net current assets for 1958 was primarily accounted for by the conversion of 4 of the company's vessels, for the new Seamobile service, at a cost of $3,519,809.↩